UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                          |   |                    |
|--------------------------|---|--------------------|
| UNITED STATES OF AMERICA | ) |                    |
|                          | ) |                    |
| V.                       | ) | NO. 09-CR-10017-GAO |
|                          | ) |                    |
| TAREK MEHANNA            | ) |                    |

## DEFENDANT'S MOTION TO DISMISS COUNTS SIX AND SEVEN OF THE SECOND SUPERCEDING INDICTMENT

### I. Introduction

The defendant, Tarek Mehanna, requests that this Court dismiss counts six and seven of the Second Superseding Indictment, charging him with a violation of the False Statements Act, 18 U.S.C. § 1001(a)(2). The defendant makes three arguments. First, the statements in question under both counts are not material, and therefore not a violation of § 1001(a)(2). Second, the statements are not "statements" as defined under that statute, and therefore are not a violation of the law. Third, § 1001(a)(2) is unconstitutionally vague as applied in this case.

1

## II. Facts

The defendant, his co-defendant Ahmad Abousamra, and a cooperating witness (CW),[1] were friends. Sometime in late 2003, they decided to travel to Yemen to look for schools at which they could study Islam and the Arabic language at a later time. They did some research online, and made plans to travel to Yemen in early February 2004. Around this time, the defendant met Daniel Maldonado.

At some point prior to their trip to Yemen, Abousamra traveled to California to meet with someone there who could give Abousamra advice regarding where to go and whom to see in Yemen. There is no evidence that when Abousamra went to California, the defendant was aware of his trip. There is no evidence that the defendant was ever made aware of the substance of Abousamra's conversations with the person in California.

On or about February 1, 2004, the defendant, Abousamra, and the fellow traveler left the United States with roundtrip tickets to travel to Yemen. They had a layover in the United Arab Emirates on February 3, 2004. At that point, the fellow traveler informed the defendant and Abousamra that he had checked his email, and had learned that his father had become ill. He therefore returned immediately to the United States,

---

[1] For the purposes of this motion, this CW will be referred to as the "fellow traveler."

never having made it to Yemen. The defendant and Abousamra proceeded onto Yemen, arriving on February 4, 2004.

The defendant and Abousamra spent seven days in Yemen. They traveled around the country to try to find an appropriate religious school to which they could return at a later date. The defendant was disappointed at what they found: amenities that the defendant had in the United States were lacking in Yemen, and the defendant found them to be inadequate and disgusting. He was unsuccessful in finding an appropriate religious school.

Abousamra at this time was going through a divorce in the United States, and didn't want to return. When the defendant and Abousamra left Yemen, Abousamra went to Jordan and the defendant returned home to Massachusetts.

The defendant was first questioned by F.B.I. agents in October 2005, when they came to his home to question him about allegations that he had been filming the Leonard P. Zakim Bunker Hill Memorial bridge in Boston. He had, in fact, never filmed the bridge. One year later, the defendant learned that the Egyptian intelligence service had been asking the defendant's family in Egypt about him.

In August 2006, when the defendant and his family were on vacation in Egypt, the F.B.I. conducted a "sneak and peek" search of the defendant's home. This search was apparently performed pursuant to the Foreign Intelligence Surveillance Act

(FISA) and/or the Patriot Act. They seized the entire contents of the defendant's computer by making a copy of the hard drive. They therefore obtained copies of all instant messages the defendant had sent to Maldonado and others from January to August 2006.

Meanwhile, Maldonado had moved from Massachusetts to Texas for his job as the administrator of an Islamic-oriented website. In 2005, Maldonado relocated to Egypt with his wife and children, where he continued to work as the website's administrator. Maldonado was focused on raising his children and living his life as Islamicly as he could. He discussed in instant messages with the defendant whether it was better in that regard to live in Egypt or somewhere else. Maldonado mentioned that he might move to Yemen, because he believed that in Yemen, a Muslim could live a more Islamic lifestyle. The defendant discouraged Maldonado from moving to Yemen.

In November 2006, Maldonado moved with his family to Somalia after the Islamic Courts Union took over the country. The Islamic Courts Union has never been designated a Foreign Terrorist Organization. At the time, the defendant was unaware that Maldonado had made the move.

On December 12, 2006, the defendant received a call from Maldonado. At no time, including during this conversation, did Maldonado tell the defendant that he was living in Somalia. At

no time, including during this conversation, did Maldonado tell the defendant that he was engaged in fighting or training. At no time did Maldonado tell the defendant that he was no longer employed as an administrator of a website. The government intercepted this call and recorded it.[2]

Maldonado did tell the defendant on December 12 that he was going to "culinary school" to learn how to make "peanut butter and jelly" sandwiches. The government alleges that the defendant, Maldonado, and his friends often referred to peanut butter and jelly, or PB and J, to refer broadly to jihad, fighting, or the mere presence of guns or fighting. After the conversation with Maldonado, the defendant spoke with another friend, which was intercepted by the government. When the friend asked the defendant what Maldonado had meant by "PB and J," the defendant replied, "I don't know. I really don't."

On December 16, 2006, F.B.I. agents visited the defendant. They asked the defendant questions about Maldonado. The defendant provided answers, which provide the basis for Count Six. These answers were: (1) that the defendant had last heard from Maldonado two weeks prior to December 16; (2) that Maldonado was living in a suburb of Alexandria, Egypt; and (3) Maldonado was employed maintaining a website. The government

---

[2] The defendant believes that another person was present at this call and has provided information to the U.S. government.

alleges that the defendant had heard from Maldonado just three days before the December 16, conversation, that the defendant knew Maldonado had left Egypt for Somalia, and that the defendant knew that Maldonado was receiving military-type training and was involved in fighting and violent jihad.

The government's basis for alleging that these statements were false is its interception of the December 12 conversation between the defendant and Maldonado. On December 16, therefore, the government already possessed what it believed to be the true answers to the question the agents posed to the defendant.

During the same December 16 conversation, the F.B.I. agents asked the defendant about his February 2004 trip to Yemen. In response to their questions, which provide the basis for Count Seven, the defendant stated that: (1) he, Abousamra, and the fellow traveler went to Yemen to attend religious and Arabic language schools in Yemen; (2) all their research for the trip had been done online, that no one assisted them, and that he did not know anyone who resided in California; and (3) while in Yemen, the defendant and Abousamra traveled to the Hadramawt province and the Dar al-Mustafa school. The government alleges that the defendant traveled to Yemen to find and receive military-type training at a terrorist training camp and to participate in violent jihad and terrorism. The government also alleges that the defendant never intended to attend and study at

6

the Dar al-Mustafa school, nor did he intend to attend any other school for Arabic and Islamic training. Finally, the government alleges that prior to the trip, the defendant received assistance with the trip, including learning of places to go and people to contact in Yemen from a person who resided in California and who had previously attended a terrorist training camp.

The government's basis for alleging that these statements were false appears to be the defendant's instant messages, which the government seized in August 2006—four months before the December 16 interview—and the report of the fellow traveler, who had been cooperating with the government for a substantial time prior to December 16, 2006. On December 16, therefore, the government possessed what it believed to be the true answers to the questions the agents posed to the defendant on that day.

### III. Discussion

The defendant contends that his statements are not "material," pursuant to the meaning of that term in 18 U.S.C. § 1001(a)(2) and court opinions interpreting it.[3] They are also not "statements" that are prohibited by that statute. Finally, § 1001(a)(2) is unconstitutionally vague as applied in this case.

**A.   The defendant's statements are not material**

---

[3] The defendant does not concede that any of his statements at issue were false.

18 U.S.C. § 1001(a)(2) states that it is a crime to "materially make any fictitious, fraudulent, or false statement or representation" in any matter "within the jurisdiction of the executive. . .branch of the Government of the United States." One element of this crime is materiality. United States v. Gaudin, 515 U.S. 506, 509 (1995).

"Materiality" under § 1001(a)(2) has been defined as a statement that "has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." Kungys v. United States, 485 U.S. 759, 770 (1988). The question is "whether the misrepresentation or concealment was predictably capable of affecting, i.e., had a natural tendency to affect, the official decision." Id. at 771.

The Supreme Court has clarified that, by requiring that false statements be material, Congress intended to criminalize some false statements, and leave other, nonmaterial, statements unproscribed. Id. at 786-87. The Court wrote that the term "materiality" "serves to distinguish the trivial from the substantive, drawing the line between statements that appear to be capable of influencing an outcome and those that do not." Id.

The question, therefore, is whether the defendant's statements, had they been false, were predictably capable of influencing the decisionmaking process of the F.B.I.

Prior to the F.B.I.'s interview with the defendant on December 16, 2006, the F.B.I. believed that it knew the answers to the questions its agents planned to pose to the defendant.

The government alleges that the defendant's statements on December 16, 2006, were inconsistent with the statements he made prior to December 16, and which were, by December 16, *known to the government*. Because they were known to the government on December 16, and because this inconsistency provides the basis for the § 1001(a)(2) charges, these statements are not material.

In a case that applied § 1001's materiality definition to another statute, the Supreme Court held that a statement is material only when a person's false statement is believed and is capable of being relied upon by the government agency. A statement is *not* material when the possibility of governmental reliance rests on the agency's knowledge that what a defendant said on one day is inconsistent with what the defendant said on a previous day. Kungys, 485 U.S. at 775. "What must have a natural tendency to influence the official decision is the misrepresentation itself. . .not the failure to state what had been stated earlier." Id. at 776.

The following example is illustrative: the government knows that on January 1 a suspect said to his friend, "I never rob any bank without my good luck ski mask." F.B.I. agents interview the suspect on January 4, and ask him, "do you own a lucky ski

mask?" The suspect responds, "I do not own a lucky ski mask." Because the government knows that the suspect does, in fact, own a ski mask, his misrepresentation of that fact can have no influence over the agents for § 1001(a)(2) purposes. Similarly, the prosecution cannot claim that the agents' decision to be made is whether they can trust the suspect to provide accurate answers and therefore to continue with the interview or not. This decision rests on the fact that the suspect failed to state on January 4 what the agents know he stated on January 1. The Kungys Court held that this type of false statement could not influence government agents for purposes of a § 1001(a)(2) indictment, and cannot therefore be the basis for a § 1001(a)(2) charge.

Because the government planned to catch the defendant in a lie and believed it had done so, any decision the government would have made as a result of the defendant's statements would have been based not on the December 16 statements *themselves*, but on their alleged *inconsistency* with prior statements known to the government. Such statements are not material, and therefore are not proscribed by § 1001(a)(2).

This Court should not be misled by the vague notion that § 1001(a)(2) "covers 'any' false statement—that is, a false statement 'of whatever kind.'" Brogan v. United States, 522 U.S. 398, 400 (1998). In Brogan, the Court invalidated the

10

"exculpatory no" doctrine, which had excluded from §

1001(a)(2)'s prohibition merely denying wrongdoing to a

government agent. Brogan did *not* question the definition of

materiality or its continued application.

In fact, the Court suggested that a situation like that

presented in the instant case falls outside of § 1001(a)(2)'s

realm. The concurring opinion noted that at oral argument, the

Solicitor General stated the troubling possibility that

government agents could "escalate completely innocent conduct

into a felony." The Solicitor General went on: "[I]f an

investigator finds it difficult to prove some elements of a

crime, she can ask questions about other elements to which she

already knows the answers. If the suspect lies, she can then use

the crime she has prompted as leverage or can seek prosecution

for the lie as a substitute for the crime she cannot prove." Id.

at 411 (Ginsburg, J., concurring).

Justice Ginsburg then suggested that Congress did not

intend to cast so large a net with § 1001. Id. at 412. She then

stated that the purpose of § 1001 was to "protect the Government

from the affirmative, aggressive and voluntary actions of

persons who take the initiative; and to protect the Government

from being the victim of some positive statement which has the

tendency and effect of perverting normal and proper governmental

activities and functions." Id. at 413 n.4. In the instant case,

11

the government approached the defendant while he was working in a Walgreen's pharmacy. The defendant took no initiative and made no affirmative or aggressive statement. This approach reflects the practical result of the Kungys rule: if agents are aware that a defendant is lying because they know of his previous, inconsistent, statement, they cannot be misled or influenced for purposes of § 1001. Being misled by the lie *itself*, and not the *known inconsistency* with a prior statement, is the harm that Congress intended § 1001 to prevent. Congress did *not* intend that § 1001 be a "gotcha" statute, as it is being applied in the instant case. The defendant's statements are therefore not material, and the § 1001(a)(2) charges against him must be dismissed.

**B.     The defendant's statements are not "statements" under section 1001(a)(2)**

Not every statement made is a "statement" for purposes of section 1001(a)(2). United States v. Chevoor, 526 F.2d 178, 183 (1st Cir. 1976); but see Brogan, 522 U.S. at 400. That which is not a statement under § 1001 cannot be the basis for a charge of making a false statement under § 1001.

The First Circuit has repeatedly stated that it is troubled by the idea that § 1001 covers F.B.I. investigations. "The courts have had difficulty in affirming [§ 1001's] coverage of F.B.I. investigations. Although differing rationales have been

used, there is widespread agreement that mere negative responses to government initiated inquires should not be included in the statutory proscription." Chevoor, 526 F.2d at 183. The First Circuit went on to state that § 1001 was intended to cover investigations for activities such as tax fraud, because they were likely to entail a monetary loss to the government. The Court suggested that where a loss of money was not an issue, § 1001 was not intended to cover F.B.I. investigations. Id.

The First Circuit described the types of statements that are not § 1001 "statements":

> Chevoor had presented no false claim against the government, nor was this investigation relative to a claim the government might have had against him. The F.B.I. questioned Chevoor in the course of a criminal investigation; he denied involvement in, or knowledge of the criminal activity. The scenario was repeated at the Strike Force office. The defendant here did not initiate anything; he did not even go so far as to fabricate a misleading story in response to the inquiries. He merely gave negative, oral responses to the questioning. No oath was given; no transcript taken. The interviews were informal. Under all these circumstances, we hold that Chevoor's responses were not 'statements' within the meaning of 18 U.S.C. s 1001.

Id. at 183-84.

In Brogan, the Supreme Court overruled a portion of Chevoor,[4] but the remainder is good law. Thus, when a defendant

---

[4] The Court in Brogan overruled only the "exculpatory no" doctrine, which stated that false statements amounting to a denial of criminal culpability were not proscribed under § 1001. For example, someone who in fact robbed a bank could tell a

presents no false claim to the government; is questioned by the F.B.I.; initiates nothing; no oath is given; no transcript is taken; and the interview is informal, a statement made in such a situation is not a § 1001 "statement." Id.

Justice Ginsburg in Brogan reiterated Chevoor's continued validity. She wrote that § 1001's "purpose was to protect the Government from the affirmative, aggressive and voluntary actions of persons who take the initiative; and to protect the Government from being the victim of some positive statement which has the tendency and effect of perverting normal and proper governmental activities and functions." Brogan, 522 U.S. at 423 (Ginsburg, J., concurring) (citing Paternostro v. United States, 311 F.2d 298, 302 (5th Cir. 1962)).

The Ninth Circuit supports the view of Justice Ginsburg and the First Circuit. In United States v. Bedore, the defendant, Bedore (or Bedord, as in the opinion), was visited at his home by an F.B.I. agent. The agent wanted to serve a subpoena upon Bedore, but apparently did not know what he looked like. When the defendant answered the door, the agent informed him that he was looking for Bedore. The agent asked Bedore for his name, and Bedore said that he was Tom Halstead, Bedore's roommate. 455 F.2d 1109, 1110 (9th Cir. 1972). The Ninth Circuit held that

government agent that he did not rob a bank. He would not thereby incur criminal liability under § 1001.

14

this false statement was not the type of statement that § 1001 was designed to prohibit. Id. The court reasoned that § 1001

> was not intended to embrace oral, unsworn statements, unrelated to any claim of the declarant to a privilege from the United States or to a claim against the United States, given in response to inquiries initiated by a federal agency or department, except, perhaps, where such a statement will substantially impair the basic functions entrusted by law to that agency.

Id. at 1111; see also United States v. Ehrlichman, 379 F.Supp. 291, 292 (D.D.C. 1974) ("Most of the courts that have considered the issue have been troubled by the application of § 1001 to F.B.I. interviews."); United States v. Bart, 131 F.Supp. 190, 198, 205 (D.MD. 1955) (Section 1001 does not prohibit a false statement that is "not initiated or volunteered by the defendants but was only an answer given in response to a particular inquiry." It prohibits "affirmative or aggressive and voluntary actions of persons who take the initiative" and is designed "to protect the government from being the victim of some positive statement.").

Based on the definition of "statement" for purposes of § 1001 as expressed by the Supreme Court, the First Circuit, and other courts, the defendant's statements in the instant case are precisely those types of statements that are *not* prohibited by § 1001. The defendant took no initiative in making the statements to the F.B.I. agents; they came to him. The interview was

15

informal; there were no oaths or transcripts taken. The defendant was not pursuing any monetary claim against the government, and the government was pursuing none against him. Known to the F.B.I. agents but not to the defendant, the statements were made in the course of a criminal investigation. Finally, the defendant made no "exculpatory no" statement; he did not deny wrongdoing, as he was never asked if he had committed any crimes. He merely answered the agents' questions.

The statements for which the defendant is now charged with a violation of § 1001(a)(2) are not "statements" pursuant to that statute. These charges must therefore be dismissed.

**C.** **Section 1001(a)(2) is unconstitutionally vague as applied in this case**

A criminal statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304 (2008). "Of these, the more important aspect of the vagueness doctrine is. . .the requirement that a legislature establish minimal guidelines to govern law enforcement." City of Chicago v. Morales, 527 U.S. 41, 65 (1999).

Justice Rehnquist, dissenting in United States v. Yermian, stated that "the language and legislative history of § 1001 can

provide no more than a guess as to what Congress intended." 468 U.S. 63, 76 (1984). He was discussing the issue of § 1001's governance when a defendant was not actually aware of federal agency involvement when the defendant made the statement, an issue not presented in the instant motion. Justice Rehnquist's observation, however, does apply here, especially when considered in light of the issues of materiality and whether a statement is a § 1001 "statement."

In 1996, Congress amended § 1001 to provide an explicit materiality requirement. 18 U.S.C. § 1001. A number of circuit decisions had already interpreted § 1001 to have a materiality requirement. By formally adding the materiality requirement, Congress intended some ("material") false statements to be prohibited under § 1001, and some ("non-material") false statements to be exempt from prohibition.

The Supreme Court's statement in Brogan that § 1001 "covers any false statement," 522 U.S. at 400, cannot, therefore, be true. The Court appeared to recognize this, opining that "a *disbelieved* falsehood [may not] pervert an investigation" and therefore is not subject to § 1001's prohibition. Id. at 402. The Court then concluded, however, that there was no basis for the premise that "only those falsehoods that pervert governmental functions are covered by § 1001." Id.

A dissenting Justice Stevens noted that the unqualified language of § 1001, as stated by the majority, rejected well-settled court interpretations that limited the statute's application. Id. at 419 (Stevens, J., dissenting).

Justice Ginsburg, concurring, was concerned with "the extraordinary authority Congress, perhaps unwittingly, has conferred on prosecutors to manufacture crimes." Id. at 408 (Ginsburg, J., concurring). She noted that at oral argument, the Solicitor General himself observed that § 1001 could be used to "escalate completely innocent conduct into a felony." Id. at 411. On prior occasions, the Government had indicated to the Court its hesitance to apply § 1001 to "simple false denials of guilt to government officials having no regulatory responsibilities other than the discovery and deterrence of crime." Id. at 414. Congress, said the Government, did not intend § 1001 to apply to such situations.

In past arguments to the Supreme Court, the government acknowledged the facility that § 1001 provided to prosecutors and law enforcement agents to manufacture crime. This is the Court's main concern that activates the vagueness doctrine. City of Chicago v. Morales, *supra*.

Despite this facility, if the language of § 1001 and opinions interpreting it were adequately to set forth what statements are § 1001 "statements" and are material, the statute

may be saved from unconstitutional vagueness. The statute and judicial opinions, however, only muddy the waters.

The Court in Brogan stated that "all" false statements "of whatever kind" are material, even though the statute itself requires that statements be "material." Justices Rehnquist, Stevens, and Ginsburg expressed their concern arising from this fundamental vagueness.

In the defendant's case, the vagueness of § 1001 is even more striking. The defendant made his statements in response to the F.B.I. visiting him. He initiated no contact, and had no claim against the government through which he might benefit as a result of a false statement. He was a passive participant in the conversation with the agents. His conversation with the agents is similar to that considered by the First Circuit in Chevoor and the Ninth Circuit in Bedore. Both circuits held that statements produced by such conversations were not governed by § 1001. Chevoor was, with the exception of the exculpatory no doctrine, affirmed by Justice Ginsburg in Brogan, supra.

If a person of ordinary intelligence had reviewed this law prior to speaking with the F.B.I., he would have concluded either that any statements he made, true or false, during such conversations were not prohibited under § 1001, or that determining which statements were prohibited and which were not was impossible. He would have no notice as to which statements

were prohibited and which were not. This inability to discern the coverage of a criminal statute, combined with the statute's ability to be a "felony generator," means that the statute is unconstitutionally vague. As applied to the defendant, § 1001(a)(2) is unconstitutionally vague. Counts Six and Seven must, therefore, be dismissed.

### IV. Conclusion

The statements the defendant made to F.B.I. agents on December 16, 2006, were not material. The agents knew the answers to the questions they had planned to ask, and so the defendant's answers were not capable of influencing any decision they had to make. The statements the defendant made were also not "statements" as defined by § 1001 and judicial interpretations of that statute. Finally, § 1001 is unconstitutionally vague as applied to the defendant. For all of these reasons, Counts Six and Seven pending against the defendant must be dismissed.

TAREK MEHANNA
By his attorneys,

CARNEY & BASSIL

*J. W. Carney, Jr.*

J. W. Carney, Jr.
B.B.O. # 074760

*Janice Bassil*

Janice Bassil
B.B.O. # 033100

Sejal H. Patel
B.B.O. # 662259
Steven R. Morrison
B.B.O. # 669533
John E. Oh
B.B.O. # 675916
Carney & Bassil
20 Park Plaza, Suite 1405
Boston, MA 02116
617-338-5566

Dated: July 15, 2011

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on or before the above date.

*J. W. Carney, Jr.*
J. W. Carney, Jr.

21