UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 09-10017-GAO |
| | ) | |
| | ) | |
| TAREK MEHANNA | ) | |

**GOVERNMENT'S MOTION IN LIMINE TO DETERMINE THE SCOPE OF DEFENSE
EXPERT'S TESTIMONY AND CONDUCT A DAUBERT  HEARING**

        The United States of America, by and through United States Attorney Carmen M. Ortiz,

and Assistant United States Attorneys ("AUSA") Jeffrey Auerhahn and Aloke S. Chakravarty,

for the District of Massachusetts, and Jeffrey D. Groharing, Trial Attorney, Counterterrorism

Section, National Security Division, United States Department of Justice, hereby renews its

request for the court to order the defense not to comment on the defense experts' challenged

proposed testimony until the court determines that the scope of the testimony the defense experts

is in accordance with the Federal Rules of Evidence.  The initial and subsequent disclosures

contain opinions of defense experts that are clearly inappropriate and would tend to confuse and

mislead the jury if commented upon during opening statement.  Since the amended defense

disclosure, the government herein specifically identifies reasons why the proposed testimony is

beyond the proper scope of this case, especially when considering that the government has pared

its expert testimony by electing not call Mr. Vidino in its case in chief, and has clarified the

scope of Mr. Kohlmann's testimony to avoid the predictive model of a homegrown terrorist.

These changes will likely have an impact on the scope of defense expert's testimony, and should

further limit the parties' reference to expert testimony in opening.  The government therefore

requests the judge to determine what limitations should be placed on comments regarding expert testimony during opening statements.  Furthermore, the government requests that the judge conduct a Daubert hearing to determine whether certain expert testimony is admissible under FRE 702.

## INTRODUCTION

On September 29, 2011, the defense provided the government with its expert disclosures. The defense did not provide any expert reports and indicated that the subject matter of the expert's testimony was "evolving."  *See* Defense disclosure at 1.  During the October 3, 2011 hearing, the defense indicated that no additional information regarding the experts' testimony would be forthcoming.  On October 3, 2011, the government filed a motion to limit defense comment during opening statement regarding the defense experts (D277), noting that the defense disclosures were inadequate. The defense responded claiming their September 29, 2011 disclosure "explain[ed] exactly" which witnesses speak to which portions of the government expert reports.  During argument on the motion, the defense again took the position that their previous disclosures were adequate.  The Court disagreed and gave the defense an opportunity to submit appropriate disclosures consistent with FRCP 16. On October 18, 2011, the defense submitted a supplemental expert disclosure.   While the current filing is a marked improvement from the previous disclosures, disclosures of certain experts fail to establish that their testimony can withstand scrutiny under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.  Similarly, in many cases the expert's the testimony is simply not relevant under Federal Rule of Evidence 401; or any probative value of the testimony is

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury under FRE 403. Furthermore, in some instances the proffered opinions would violate FRE 704.

It is important to note the government has elected not to call Lorenzo Vidino during its case in chief and has notified the defense of the same. To the extent that particular defense experts were going to be called to rebut Mr. Vidino's testimony, their testimony is no longer relevant in that respect.

Likewise, it is important to clarify the scope of anticipated testimony of Mr. Kohlmann, as many of the defense experts are proffered to respond to opinions or conclusions contained in Mr. Kohlmann's expert report that the government does not intend to elicit at trial. On August 19, 2011 , the government provided the defense and the Court a summary of Mr. Kohlmann's expected testimony. That summary was as follows:

> Mr. Kohlmann is expected to testify about several categories of relevant information and will explain his research, observations and the methodology he uses to become proficient in the area of terrorism and *al Qa'ida* related terrorism networks. Based on his dedicated study, research, personal experiences and other social scientific methods, Mr. Kohlmann has developed an expertise in this area which has routinely been deemed valuable to criminal courts around the country and the world. Mr. Kohlmann will assist the jury in understanding the relatively arcane world of *al Qa'ida*-related activities, as well as provide an historical and social scientific perspective with regard to references used by the defendant and his associates which are outside of the common knowledge of even a reasonably well-informed juror. This explanation is crucial to provide the necessary context for the jury to determine critical issues of fact in this case.

> Geopolitical history
> Mr. Kohlmann will testify about significant geopolitical events as relate to this case. This includes basic historical details such as about what had occurred on September 11, 2001, the subsequent invasion of Afghanistan, the Chechnyan conflict and the invasion of Iraq and aspects of that campaign, such as Fallujah. In addition, he will describe the history leading up to the presence of *mujahideen* and foreign fighters in Afghanistan, Pakistan, Somalia, Iraq, and Yemen,

including for example, Usama bin Laden's presence there.  With regard to Somalia he will describe the interrelationship between the *mujahideen*, such as Islamic Courts Union, *al Shabaab*, *al Qa'ida*, and the military conflict as it evolved during the period charged in the indictment.  He will also describe *Lashkar e Taiba* and other organizations operating in and maintaining terrorist training camps in Pakistan, including their *raison d'etre* and the conflicts to which their graduates matriculated, such as Kashmir and Afghanistan.

<u>al Qa'ida</u>

      The government anticipates that Mr. Kohlmann will testify about the formation, structure, *modus operandi*, pattern and practice of *al Qa'ida*, its affiliates and adherents.  He will explain the internet and media operations of *al Qa'ida*, including such organizations as *As Sahab* Media Foundation, Labayk Media Foundation and the media campaigns of *al Qa'ida*, and other terrorist organizations and individuals.  He will explain the evolution of *al Qa'ida*'s network around the world, including the affiliates of *al Qa'ida* in the Arabian Penninsula, and *al Qa'ida* in Iraq.  Mr. Kohlmann will describe the significance of specific *al Qa'ida* related individuals and/or members and leaders such as Usama bin Laden, Ayman al Zawahiri, Abu Musab al Zarqawi, Anwar al Awlaki and others, as well as specific items of media produced and distributed by *al Qa'ida*.  In addition, he will describe the interrelationship of individuals and media who were supportive of violent jihad to the objectives and mission of *al Qa'ida*.  As part of his discussion about the *modus operandi* of *al Qa'ida*, Mr. Kohlmann will describe how *al Qa'ida* solicits, encourages, creates, produces and consumes supportive media for various of its essential purposes, such as recruitment, as a means of cultivating terror, and communicating to its adherents and affiliates.  Specifically he will discuss the role of translation of materials for wider consumption, digital production and editing of propaganda materials and other media campaigns as an important component of *al Qa'ida*'s operations.

<u>Significant individuals and media</u>

      Mr. Kohlmann will also describe individuals and media who may not have been within the structure of *al Qa'ida*, but nevertheless are significant to the contemporary motivators of violent jihad and are sometimes perceived as inspiring *al Qa'ida* such as Abdullah Azzam, Sayyid Qutb, and Muhammad Al Maqdisi.  Similarly, Mr. Kohlmann will describe and discuss significant media produced by these individuals (or by others of speeches and writings of these individuals), their historical impact, as well as the effect that translation of these materials into English had upon the contemporary movement to engage in violent jihad and upon recruitment for *al Qa'ida* related activities.

Analysis of media belonging to the defendant

      Mr. Kohlmann was provided a copy of the defendant's computer hard drive by the government, and he analyzed it. Mr. Kohlmann will discuss his analysis of the defendant's computer hard drive and some significant items retrieved from it as relates to the indictment. Specifically, he will identify significant media located on or referenced in communications stored on the hard drive, and explain why they are significant as relates to *al Qa'ida* in such respects as its operations, recruitment, propaganda campaigns and objectives. Mr. Kohlmann will describe his conclusions about the relative roles and identities of different individuals whose communications were captured on the defendant's media. Similarly, in as much as the defendant's communications were also located on his computer hard drive, Mr. Kohlmann will discuss the significance of some of these communications as they relate to the defendant's conspiracy to provide material support to terrorists and a terrorist organization.

The role of the internet and on-line terrorism-related social networking forums

      Mr. Kohlmann will describe and discuss the use of on-line web forums by *al-Qa'ida* adherents and other terrorism supporters. He will describe the role of the internet in the radicalization and recruitment of individuals, many from Western countries, into support functions for *al Qa'ida* and other international terrorist organizations. He will specifically discuss forums such as *At Tibyan* publications, Clearguidance.com, and Islamic Network.com. He will also describe the significance of select correspondence on the *At Tibyan* publications, including those between the defendant and co-conspirators.

The role of Paramilitary/terrorist training camps

      Mr. Kohlmann will describe the significance of military-type training camps to *al Qa'ida* and other terrorist organizations, generally and also specifically as they relate to "home-grown" Western individuals. Mr. Kohlmann will also discuss the defendant's and his associates' stored communications as they relate to such training camps.

Cryptic or Disguised communications

      Mr. Kohlmann will discuss the use and interpretation of cryptic, coded or otherwise disguised communications as used by supporters of violent jihad. This includes, for example, references to seemingly innocuous surrogates which actually have a dual-meaning relevant to a jihadist objective, to the use of pseduonyms, and to the encryption of communications.

Discussion of media related to the defendant's

      Mr. Kohlmann will also discuss significant communications, events and media as they relate to the defendant as gleaned from other sources such as the

arrest and conviction of associates of the defendant around the world in other cases. For example, the defendant associated with individuals from Atlanta, Georgia and the United Kingdom, and Mr. Kohlmann is familiar with the interrelationship between these individuals as well as others. In addition, many communications in which the defendant participated make reference to or involve the transmission of various pieces of media with which Mr. Kohlmann is familiar, and he will provide information about them, including describe what they are and their significance. Mr. Kohlmann will also discuss some of the information described below related to the UK computer forensics analysis.

Testimony at trial

Mr. Kohlmann may also be provided with information as develops at trial such as witness testimony concerning the defendant's activities, and exhibits introduced through others. To the extent that these activities are influential to Mr. Kohlmann's analysis related to the activities of the defendant and his co-conspirators, he will render those conclusions.

Conclusions

Mr. Kohlmann will provide conclusions as to how the defendant's and his co-conspirators' activities furthered the objectives of *al Qa'ida* and related terrorist organizations, how they were responsive to the call for such support and the needs of these entities, and that they are integral to the longevity of these activities and their related movements.

The government does not intend to solicit testimony from Mr. Kohlman regarding the factors as to whether a person or persons might fit the profile of a "homegrown" terrorist network or whether the defendant is a homegrown terrorist or violent extremist. See Kohlmann Expert Report p. 6.

## **DISCUSSION**

The defense should not be allowed to comment on its proposed experts' testimony until a finding has been made regarding admissibility. Based on the disclosure provided by the defense, portions of the proffered testimony of the defense experts is inadmissible for a number of reasons. Based on comments from the defense, in light of the government's decision not to call

Mr. Vidino and to limit Mr. Kohlmann's testimony as outlined above, it is likely the defense will elect not to call many of the experts previously noticed, or at a minimum revise their proffered testimony to take into account the scope of the goverment expert's expected testimony. Therefore, the government respectfully requests the judge to determine the proper scope for comments on the defense expert's testimony prior to opening statements in this case.

**1**.     **Dr. Marc Sageman**

The government agrees that Dr. Sageman is a counterterrorism expert and *could* qualify as an expert under FRE 702 for certain testimony.  Having said that, the defense request is far too broad and certain opinions proffered by the defense would be inappropriate under FRE 401, 403, 702, and 704.  The government will attempt to analyze the proffered testimony paragraph by paragraph and address deficiencies accordingly.

The supplemental disclosure states:

> Dr. Sageman will deconstruct Kohlmann's and Vidino's description of what Al-Qaeda is. Dr. Sageman's view is crucial because Count One of the Indictment presupposes the existence of Al-Qaeda as a Foreign Terrorist Organization and charges Mehanna with "materially supporting" this organization. Establishing what sort of organization Al-Qaeda is, then, becomes a crucial factual inquiry. Dr. Sageman will testify that the old Al-Qaeda is mostly dead. The government is seeking here to ferret out homegrown terrorism, rather than a direct threat from Al-Qaeda as an organization. Given the ruling in Holder v. Humanitarian Law Project, the government must show that the defendant's translations were under the direction of or in coordination with Al-Qaeda. Dr. Sageman will explain that Al-Qaeda is not and was not in 2004 or 2006 a "top down" hierarchical organization.

Although based on Dr. Sageman's resume it seems apparent that he could testify as an expert on *al Qa'ida*, it is not clear how the testimony in the paragraph above is relevant to this case.  It seems unlikely that the defense would contest that *al Qa'ida* is a FTO, particularly with

this witness, considering his writings are all consistent with the view that *al Qa'ida* is in fact an FTO.

His opinions on what the government is trying to do (the government is seeking here to ferret out homegrown terrorism, rather than a direct threat from *al Qa'ida* as an organization), would not be the appropriate subject of expert (or any witness) testimony.  This trial is not about the government's strategy against *al Qa'ida*, or whether the defendant is a terrorist (as defined by an expert), but rather whether the actions of the defendant violated specific criminal statutes, something for the jury, and not the experts, to determine.

The following three paragraphs are included on page 7 of the defense supplemental disclosure and suggest that Dr. Sageman will testify regarding the following:

> Dr. Sageman will explain how terrorism networks have evolved since 9/11. Just after 9/11, Dr. Sageman built a database to analyze statistically who Al-Qaeda terrorists were. He determined that they were not all mentally ill, uneducated or lower-class. In fact, very few had mental illnesses, they tended to be educated, and many came from the upper-middle classes. Since 2005, Dr. Sageman has had government security clearances restored to help various government agencies deal with the problem of terrorism. He has developed a series of "indicators" that can help law enforcement predict who and not to investigate. He has presented these indicators to the FBI, the U.S. Army, the New York Police Department, the Department of Homeland Security, and other government entities, which have adopted them in their attempt to protect the population against terrorism.

> Dr. Sageman's reason for developing these indicators is one of government efficiency. He will report that there have been 66 global neo-jihadi terrorist attacks or plots since 9/11. He will state that the prevalence of terrorists in the general population is lower than four terrorists per hundred million people per year. His task was to identify how to detect these few people and disrupt their plots. Law enforcement sees thousands of young people bragging and pretending that they are terrorists, and yet they do nothing, tying up precious resources in the fight against terrorism. Even with a near perfect instrument (99.5% accuracy) to detect terrorism, law enforcement would have to arrest about 250,000 innocent

people to be sure to capture a true terrorist. Hence this points to the importance of having a set of valid indicators to help this search with greater accuracy.

It was Dr. Sageman's task to determine what factors or indicators distinguished those that turned to violence from people who were just like them but did not turn to violence. This is the exact analysis Kohlmann and Vidino offer in their reports, but they set out their own factors and criteria as to what makes a person a "radical jihadi terrorist" or a "homegrown terrorist." Dr. Sageman conducted extensive research to determine his criteria and then set out to prioritize those criteria for law enforcement to best use their resources.

Again, this testimony might be relevant to investigative and law enforcement agencies who are trying to identify the most serious targets amongst self proclaimed "jihadi wannabes" on the internet, but it is wholly irrelevant to the question of whether the acts of the defendant violated specific criminal statutes. Whether a predictive model of terrorist activity is accurate or not, the defendant is charged with conspiring and attempting to provide material support to terrorism and related charges, not committing acts of terror.

The Federal Rules of Evidence permit an expert witness to testify "in the form of an opinion" if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. As the Supreme Court has held, it is the task of the trial judge to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *United States v. Pena,* 586 F.3d 105, 110 (1st Cir. 2009) (*citing Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597(1993)). This involves a preliminary assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Pena*, 586 F.3d at 110.

9

Here, the defense has indicated that Dr. Sageman has developed a series of "indicators" or factors that can help law enforcement predict who to and not to investigate (referring to individuals suspected of terrorist activities). The defense disclosure suggests that he has developed a model based on a four-year study, however they have not indicated what that model is, or how he has applied it in this case. Rather the defense disclosure references only selected portions of the thesis or model. It *might* be sufficient for the government and the court to analyze Dr. Sageman's testimony and determine if it would meet *Daubert* standards if the defense had provided the underlying study or a more detailed explanation of the study and its findings. The government has requested the defense to provide a copy of the referenced study as well as any material that Dr. Sageman has written to explain his model. At this point, it is not possible to conduct the exacting analysis of the foundation of his opinions as required under FRE 702. Prior to Dr. Sageman testifying, the defense must establish that his testimony is the product of reliable principles and methods and they have not done so here. The government therefore requests that should the court find Dr. Sageman's predictive model of terrorist activity to be relevant, the court schedule a Daubert hearing so that his testimony can be explained in detail and the court can conduct an appropriate analysis prior to his testimony being heard at trial.

As mentioned above, the government is not going to elicit an opinion from Mr. Kohlmann that the defendant is a violent extremist or homegrown terrorist, so the extent the purpose of Dr. Sageman's testimony is to rebut such characterizations, it is not relevant. Dr. Sageman's testimony that the defendant was "part of the social protest blob and not an indicator

of a 'radical jihadi terrorist,' is inappropriate. The proffer adds "[t]hese decisions on Mehanna's part are the clearest proof of his intent to stay a part of the blob and not join the numerically tiny fringe set of terrorists."

Even if Dr. Sageman's testimony can survive an analysis under Daubert, his testimony should not be admitted under FRE 704(b).  Dr. Sageman ultimately concludes that the defendant's writings and activities "were, in fact, part of the social protest blob and not an indicator of a "radical jihadi terrorist."  Dr. Sageman's basis for this conclusion is that the defendant did not commit terrorist acts so he obviously had no intent to be a terrorist.  Even if such testimony was relevant, Dr. Sageman's principles and methods can withstand scrutiny under FRE 702, he should not be permitted to provide an expert opinion on the defendant's intent as this would run afoul of FRE 704(b).

Rule 704(b) excludes psychiatric based opinions and inferences, like those of Dr. Sageman, that are directed at a defendant's intent, particularly when the opinion is based on subjective matters unique to the defendant. Dr. Sageman's testimony will invade the province of the jury by offering psychiatric expert opinion on Mehanna's intent to knowingly join two conspiracies and assist *al Qaida*.  Unlike the use of an expert to circumstantially prove a defendant's intent by presenting objective indicia of a hypothetical person's intent to commit a crime (*e.g.* distributing narcotics) and allowing the jury to apply the facts to those objective markers in order to reach a conclusion, Mehanna proffers Dr. Sageman to give the jury the conclusion. This invades the province of the jury and should not be allowed.

In conclusion, the government requests the judge make a determination regarding the

appropriate scope of comments regarding Dr. Sageman's testimony prior to opening statements. Making comments about experts opinions of the defendant's intent would be misleading and risk confusing the jury. To the extent the defense still wishes to elicit opinions from Dr. Sageman regarding his predictive model of terrorist activity, the government requests the court conduct a *Daubert* hearing to properly assess the testimony.

### 2.    **Dr. Mohammed Fadel**

The defense supplemental disclosure does not differ significantly from the previous disclosure. To the extent that the defense has provided the same summary, the government incorporates by reference our reply (D 303) to the defense response to our motion *in limine* to limit comment during opening statement regarding defense experts.

The supplemental request includes the following language:

> Kohlmann and Vidino reference these scholars liberally throughout their reports. They erroneously conclude that the defendant's knowledge of their writings, his admiration for them and his discussion of them indicate that he is an extremist.

As we previously indicated, the government does not intend to present any evidence that characterizes a particular scholar. The government may present evidence of the defendant's writings that discuss his views on a particular scholar (as well as *al Qa'ida* leaders views of some of these scholars as relate to the defendant's state of mind). Whether or not the defendant's views coincide with Dr. Fadel or any other scholar, or whether the defendant's views are Islamically acceptable is irrelevant. What is relevant is the defendant's state of mind and his own conduct, facts which no scholar can divine based on a recitation of the landscape of

religious belief.  It would not be helpful for the jury to hear testimony regarding an expert's views on particular Islamic scholars.

The supplemental filing includes the following sentence: "[h]e will also testify to the defendant's limited level of understanding in reading and writing classical Arabic."  The supplemental does not explain how Dr. Fadel will be able to opine on the defendant's reading level.  The Federal Rules of Evidence permit an expert witness to testify "in the form of an opinion" if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  Here, the defense has offered nothing to demonstrate that Dr. Fadel's opinion on the defendant's level of understanding in reading and writing classical Arabic is the product of reliable principles and methods.  The defense has not provided the results of any reading comprehension tests in its reciprocal discovery.  Although according to Dr. Fadel's resume he is fluent in classical Arabic, there is no indication that he has taught Arabic or has any experience in formally evaluating the skill level of a particular Arabic writer.   For this testimony, the defense has not provided a sufficient basis for Dr. Fadel's opinion or demonstrated that Dr. Fadel is qualified to make such an assessment.  See FRE 16 (b)(1)(C).  Therefore the defense should not provide any comment on this testimony in the absence of such a demonstration and finding from the judge that Dr. Fadel is indeed qualified to provide such an opinion.

The final addition to Dr. Fadel's disclosure is the following paragraph:

Dr. Fadel will testify about the items in Mehanna's bedroom. He will note that Mehanna's collection of books, audio and videotapes, and papers are consistent

13

with a desire to learn. Mehanna had a wide range of scholars and did not read only "jihadi" literature, as the government experts claim.

Ascertaining a person's "desire to learn" based on a review of materials found in their bedroom is not an appropriate subject of expert testimony. Again, the defense has made no showing how Dr. Fadel's opinions regarding these materials were the produce of reliable principles and methods. If the defendant wants to introduce the fact that he possessed various materials because he had a desire to learn, it should come from testimony provided by the defendant. Likewise, whether or not the defendant possessed other materials is not relevant. Assuming *arguendo* the possession of certain materials are relevant, that fact could be elicited on cross-examination of agents who seized or photographed materials during searches conducted at his residence.

A final objection to the proffer concerning Dr. Fadel (which applies to much of the defendant's supplement) is the defense often states that the expert will testify concerning a certain subject area, but does not disclose what it is the expert will say about that subject. As such, it is difficult to determine if: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. The defense has therefore failed to meet their burden, and until doing so should not be permitted to comment on or offer the evidence at trial. See *Flebotte v. Dow Jones & Co., Inc.,* No. 97–30117–FHF, 2001 WL 35988081, at *1 (D. Mass. Feb. 7, 2001) (The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence).

**3**.     **Dr. Brian Glyn Williams**

The defense has provided the following additional information for Dr. Williams:

To the average viewer, the movies were trendy and cool.  Young Arabs found the videos exciting.   They wanted heroes and role models, and these videos established their legend.

Dr. Williams will also testify about other videos and images, such as the images from Abu Ghraib, and put the fascination with war images in cultural context.

Dr. Williams will testify that there is no evidence that there has ever been any attack inspired by the internet.  In fact, Afghanistan is the country with the smallest number of internet users and has the highest level of jihadist activity. The link between internet and video use and terrorist activity is impossible to make. Contrary to Kohlmann and Vidino's assertions, there is no proof that watching videos means a person is radicalized or going "operational." He will testify that there has been no scientifically based study that links video watching with terrorist acts.

Dr. Williams will also address the disturbing and gory scenes depicted in these videos. He will testify that young adults often "try out" identities as part of their development. Some become Goth, join football teams, become computer geeks, or join motorcycle gangs. All of these affiliations are expressions of identity. Playing violent video games is no different than watching these jihadi videos, but no one asserts that every young adult who plays Grand Theft Auto is going to become a criminal.

As for the videos themselves, Dr. Williams will testify that these are scenes of war. They are horrible and sad because war is a horrible and sad phenomenon. Scholars like Maqdisi criticize videos like the beheading ones. Dr. Williams will discuss videos available on You Tube that depict American soldiers killing Muslims while rock and roll music provides the background.  Dr. Williams will testify that videos are not a part of any ultimate catalyst that leads to violent jihadi action.

While Dr. Williams has an impressive resume and he no doubt has had some very

interesting experiences and has expertise in certain areas, there is no indication that he has

studied the success or failure of jihadi videos or that he has any data on the number of people who view jihadi videos.  Likewise, there is no explanation of how Dr. Williams has come to an opinion on the success of jihadi videos (or even whether jihadi videos are successful as a recruiting tool or not).  In fact, the proffer indicates that he is not aware of such a scientifically based study.  In any event, the government concedes that not everyone who watches jihadi videos is a terrorist or someone who wants to conduct a terrorist act and Mr. Kohlmann will not testify otherwise.  The fact that the defendant watched, discussed, and disseminated videos is relevant to demonstrate his state of mind when he performed various acts that are alleged in the indictment.  The fact that many others watch videos and never engage in criminal activity is not relevant.  In addition, this is not a case about whether or not jihadi videos are an effective tool of *al Qa'ida* and other terrorist.  The evidence will be that the defendant used videos (some which were received from *al Qa'ida* as an inspirational tool, and was involved in creating and disseminating such media for that purpose.)  Many of the videos, including the ones the defendant translated, include calls by soon to be martyrs for all young Muslim men to join the fight against the United States so that they could also be rewarded with Paradise.  The jury's opinion about whether this was an effective tool (or a worthwhile investment of resources by terrorists - including the defendant) will not be solicited; therefore Dr. William's opinion on their effectiveness is irrelevant.  By contrast, Mr. Kohlmann will not opine on their effectiveness as much as their role in the strategy of al Qa'ida and other terrorist groups and his observations about them specifically.

16

The disclosure indicates Dr. Williams will "put the fascination with war images in cultural context."   It is not clear from the request exactly what this means or how it would be relevant to this case.  Dr. Williams has extensive experience in studying wars, but there is no indication that he has conducted any in depth study on the fascination with war images.  To the extent studying the fascination with war images is part and parcel with the study of war, there is no indication how his testimony in this regard would assist the trier of fact to understand the evidence or determine a fact in issue.

Finally, the defense proffers that Dr. Williams will testify regarding young adults "try[ing] out" identities, including becoming Goth or joining football teams, becoming computer geeks, or joining motorcycle gangs, stating all of these affiliations are expressions of identity. There is no indication that Dr. Williams has any experience in adolescent psychology or any insight into why someone tries out an identity.   Permitting him to offer pseudo-psychological testimony under the auspices of expert testimony would mislead the jury and clearly not assist the trier of fact to understand the evidence or determine a fact in issue.

The proffer goes on to state that playing violent video games is no different than watching jihadi videos.  While perhaps reasonable minds can differ about whether playing a violent video game is comparable to watching a video showing United States citizens being decapitated or dismembered while calling on all Muslims to engage in Jihad against Americans and Jews, it is not apparent that Dr. Williams' opinions on this issue (which he admits are not scientifically based) would assist the trier of fact to understand the evidence or to determine a

17

fact in issue. This is the stuff of defense counsel argument, not expertise about something out of the jury's ken that will help them with their fact-finding mission.

**4**.    **Gregory Johnson**

The government does not dispute that Mr. Johnson is an expert on Yemen; however, none of the proffered testimony would assist the trier of fact to understand the evidence or to determine a fact in issue.  As the government has indicated above, the government will not elicit testimony from Mr. Kohlmann regarding the factors for assessing whether a person might fit the profile of a homegrown terrorist or violent jihadi extremist, or that Mehanna is a "leading progenitor within a genuine 'homegrown' terrorist network.  Similarly, the government is not calling Mr. Vidino, so obviously Mr. Johnson does not need to rebut information from Mr. Vidino's report.

The government is not calling an expert to testify regarding the purpose of the defendant's travel to Yemen or to establish that Yemen was a jihadi stronghold in 2004. Testimony regarding the history of Yemen, and *al Qa'ida*'s presence in Yemen (or lack thereof) will not assist the trier of fact to understand the evidence or determine a fact in issue.  The government has only alleged that the defendant conspired and attempted to obtain terrorist training in Yemen, not that he succeeded. The issue at trial is not what existed in Yemen, it is what the defendant and co-conspirators thought existed in Yemen.

The evidence offered at trial related to Yemen will come from a witness who the defendant and his co-conspirators contacted prior to their travel; one of the defendant's co-conspirators, who will testify why he, the defendant, and Mr. Abousamra wanted to travel to

Yemen, and then Iraq; and chats, emails, and other materials written by the defendant which demonstrate his intent.

Whatever minimal relevance Dr. Johnson's testimony might have would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The inference that the defense is trying to create is that since there were not camps and/or terrorist facilitators in Yemen in 2004 when the defendant traveled there, it must follow that the defendant did not go there to find a camp or terrorist facilitator. The link the defense fails to make, and cannot make, is that the defendant had the same knowledge as Dr. Johnson did in 2004. There is no evidence to suggest that is the case and the defendant's own intercepted communications and the testimony of one of his fellow travelers reflect quite the opposite. The evidence will be that when the defendant arrived in Yemen he was told that the terrorist training camps in Yemen were shut down after "the Towers fell," *i.e.,* after September 11, 2001. Mr. Johnson's tesimony on this issue is unnecessary. Permitting this testimony and permitting the defense to argue the defendant could not have been successful in his conspiracy because of the lack of training camps and facilitators at the time would imply the government must prove the existence of such camps or facilitators. The defendant is not charged with attending a training camp. The government is not required to prove that there were terrorist camps or terrorist facilitators in Yemen when the defendant traveled there and the testimony should be excluded as irrelevant. Factual impossibility is not a defense to any of the Yemen related charges, and testimony in furtherance of the same is either a call for jury nullification or other confusion.

Similarly, expert testimony that Yemen is a religiously and linguistically-significant country will not assist the trier of fact to understand the evidence or determine a fact in issue. There is no dispute on this issue. Likewise, the government will not present evidence that Dar al-Mustafa was affiliated with *al Qa'ida*. In case the defense misunderstands the government's evidence; the *Dar al-Mustafa* school was chosen as the school to identify to Customs officials as a destination precisely because it was *not* considered an *al Qa'ida* supporter. If the defense theory is that the defendant's attendance at Dar al-Mustafa was in fact the purpose of his trip, then Mr. Johnson's testimony does not make that fact more likely. In this regard, Mr. Johnson's testimony is completely consistent with two of the government's witnesses, and there is no need to call an expert, as the testimony could tend to confuse the jury.

The government is also not going to offer expert testimony regarding Shaykh Muqbil bin Hadi al-Wadiee. Dr. Johnson's testimony regarding Shaykh Muqbil would therefore be irrelevant. Based on the scope of the testimony the government intends to offer it does not appear any of Mr. Johnson's testimony will be relevant.

### 5. **Dr. Ebrahim Moosa**

The supplemental request is similar to the previous defense disclosure. To the extent that the defense has provided the same summary, the government incorporates by reference our reply (D 303) to the defense response to our motion to limit comment during opening statement regarding defense experts. The following paragraph was not included in the original disclosure:

> Dr. Moosa will also explain the religious origins of Islam and how Salafism came to be. Because the government experts constantly tag Mehanna as a "violent Salafi," it is very important that the jury hear the correct description of what a Salafi is. Dr. Moosa will explain that a Salafi is someone who believes in

20

following the original teachings of Islam with little room for contextual
interpretation. It is someone who believes in a return to the time of the Prophet
Mohammad and the first three generations after him when the hadith,
documenting the prophetic tradition, and Sunnah came to be canonized. Salafism
is not synonymous with violence, and in fact, Dr. Moosa will testify that Salafis
are scholars who have a quest to find the original and true impulses of their faith.

The government will not present any evidence or elicit any testimony suggesting that the
term Salafi is synonymous with violence. What a Salafi believes will not be at issue at trial and
any reference to the label will only be incidental if a witness finds the word useful in explaining
his testimony. What will be at issue is what the defendant did and religion will only be relevant
to the extent the defendant used religion to justify his acts.

Finally, the attempt to have Dr. Moosa discuss "how the freedom of speech is American
Muslim's lawful expression of disagreement with U.S. foreign policy" is an effort to interject the
First Amendment as a defense to the charges – something that is wholly inappropriate, but
transparently the intent of the defense.

### <u>6</u>.    **<u>Dr. Andrew March</u>**

The supplemental disclosure includes additional information consistent with that
contained in the previous disclosure. Essentially, Dr. March's proffered testimony appears to be
tailored to explain what the defendant was thinking at the time he took certain acts. Testimony
of this nature is not "the produce of reliable principles and methods," and should be excluded
under FRE 702. If the defense wants to provide an explanation for the defendant's conduct they
should have to call the defendant. Having surrogates testify to explain the defendant's views is
not appropriate. Testimony "about Mehanna's struggle with being a Muslim and an American,"
while an interesting academic discussion, is not relevant to any of the issues in this case.

21

Although motive and intent are relevant in a criminal case, efforts by an expert to opine on the state of mind of the defendant based on conflcits created by his ethnic and religious identity, are not.

Moreover, such evidence would be hearsay and even though experts can rely on otherwise inadmissible evidence when rendering their opinions, this is clearly not the situation where relying on an exception to the hearsay rule is appropriate.  Even if the defense could overcome the hearsay objection, a witness simply cannot testify to a defendant's state of mind when he committed a particular act.  *See* FRE 704(b).   To the extent the testimony has any relevance; the probative value would be very little and is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.

Dr. March's testimony will not assist the trier of fact to understand the evidence or to determine a fact in issue.  The jury will be charged with determining whether the defendant's conduct violated various criminal statutes.  Whether or not his actions were consistent or inconsistent with Islamic religious doctrine is irrelevant to whether he intentionally committed or agreed to commit an act or acts that violated U.S. federal criminal law.

### 7.  __Dr. Steven Durlauf__

Dr. Durlauf's proffered testimony focuses entirely on the premise the government experts are going to offer testimony on the probability that the defendant is going to commit a terrorist act.  The government is not offering such testimony, therefore Dr. Durlauf's testimony is not relevant.  In addition, criminal trials are not about probablities that a defendant might commit the

charged offenses, but whether he in fact committed, attempted or agreed to commit the charged

acts.  Predicting probabilities of this sort have no place in this criminal trial.

## <u>CONCLUSION</u>

Accordingly, for the reasons stated herein, the Government respectfully requests the

court to restrict the defense from making comments during opening statements regarding the

testimony of Dr. Marc Sageman, Dr. Mohammad Fadel, Dr. Brian Glyn Williams, Dr. Gregory

Johnson, Dr. Ebrahim Moosa, Dr. Andrew March, and Dr. Steven Durlauf until the judge has

made a decision about the proper scope of their testimony.  The Government also requests the

judge to conduct Daubert hearings concerning the testimony of certain experts as discussed

above.

Respectfully submitted,
CARMEN M. ORTIZ
United States Attorney


Aloke S. Chakravarty
Jeffrey Auerhahn
Assistant U.S. Attorneys


By: /s/ Jeffrey D. Groharing

Jeffrey D. Groharing
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice

Date:   October 24, 2011

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have discussed this matter with counsel, and this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ Jeffrey D. Groharing  </u>
Jeffrey D. Groharing
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice
