```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS




                                        )
UNITED STATES OF AMERICA,               )
                                        )
          Plaintiff,                    )
                                        ) Criminal Action
v.                                      ) No. 09-10017-GAO
                                        )
TAREK MEHANNA,                          )
                                        )
          Defendant.                    )
                                        )




             BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE


                           MOTION HEARING



            John J. Moakley United States Courthouse
                         Courtroom No. 9
                        One Courthouse Way
                   Boston, Massachusetts  02210
                     Monday, October 3, 2011
                          11:06 a.m.




                 Marcia G. Patrisso, RMR, CRR
                      Official Court Reporter
                  John J. Moakley U.S. Courthouse
                  One Courthouse Way, Room 3510
                   Boston, Massachusetts  02210
                         (617) 737-8728

            Mechanical Steno - Computer-Aided Transcript
```

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: Aloke Chakravarty and Jeffrey Auerhahn,
3              Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6         By: Jeffrey D. Groharing, Trial Attorney
               National Security Division
7         950 Pennsylvania Avenue, NW
          Washington, D.C.  20530
8         On Behalf of the Government

9         CARNEY & BASSIL
          By: J.W. Carney, Jr., Esq.
10             Janice Bassil, Esq.
          20 Park Plaza
11        Suite 1405
          Boston, Massachusetts  02216
12        On Behalf of the Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  All rise.

 3              (The Court enters the courtroom at 11:06 a.m.)

 4              THE CLERK:  The United States District Court for the

 5      District of Massachusetts.  Court is now in session.  Please be

 6      seated.

 7              For a motion hearing, United States versus

 8      Tarek Mehanna, 09-10017.  Would counsel identify yourselves for

 9      the record.

00:14 10         MR. CHAKRAVARTY:  Good afternoon, your Honor.  For the

11      government, Assistant U.S. Attorneys Aloke Chakravarty and

12      Jeffrey Auerhahn, and Counterterrorism Section Attorney Jeffrey

13      Groharing.

14              COUNSEL IN UNISON:  Good morning, your Honor.

15              MR. CARNEY:  Good morning, your Honor.  J.W. Carney,

16      Jr., for Tarek Mehanna, and with me is Attorney Janice Bassil,

17      co-counsel.

18              MS. BASSIL:  Good morning, your Honor.

19              THE COURT:  All right.  I believe there are a couple

00:15 20      of motions I want to hear from you about, but there are also

21      some -- I went through the pending motions, and there's some

22      old housekeeping kinds of things which we'll also clear up just

23      for the record.  I think these have been operationally dealt

24      with, but not formally terminated.  One is 108, the motion

25      regarding reorganization of discovery and so on.  That's sort
```

1    of been supplanted by the attorneys working together.  So I

2    think that's moot, actually, at this time.

3          There was a motion for discovery related to FISA.  I

4    think that was, if not explicitly, implicitly dealt with at the

5    FISA ruling.  That's Number 113.  That's denied, nunc pro tunc,

6    if necessary.  There was a motion to file something under seal,

7    128.  That's granted nunc pro tunc.  There was a motion back

8    when we were hearing argument about release on bail, a motion

9    for leave to file a reply to the government's opposition.  That

00:16 10   is also granted nunc pro tunc.  That's Number 137.  And then

11   there's another motion to seal, Number 246.  Just a motion to

12   seal.  So that's granted.

13          Okay.  First I'd like to hear from you on the Docket

14   No. 231, which is the defendant's motion to lift the protective

15   order.

16          MS. BASSIL:  Yes.  Obviously, your Honor, the trial is

17   very close.  We have been attempting to interview witnesses.

18   We want to talk to them about people we know are on the

19   government's witness list.  We want to show them certain

00:17 20   statements that people have made, ask them what they know about

21   this person, ask them what is contradicted by their experience.

22   We also want to share information, frankly, with the

23   defendant's parents and with his family.  They should know what

24   is going on.

25          The government's response is, frankly, we can talk to

1    these witnesses, we just can't tell them the person is a

2    witness, which seems a little bit crazy.  So we go to a

3    potential witness and we say, "We'd like to talk to you about

4    so-and-so, but we're not saying he's a witness.  We just want

5    to spend two hours of your time with a private investigator."

6    So this is just form over substance.

7           The government raises this issue that the defendant's

8    name has been posted on a website.  We have no control over

9    that.  We have no control over what gets posted and what

00:18 10   doesn't.  And frankly, the Muslim community is relatively small

11   in this area, and I would not be surprised if they're pretty --

12   already aware of who the major witnesses are in this case.

13          I think it's time to lift this protective order.

14   There's a portion of it we want to address with you ex parte.

15   But as far as this portion of it, the government's opposition

16   is just form over substance.  It is critical at this point.

17   And I have found, by the way -- in the *Jencks* material I found

18   exculpatory evidence that should have been turned over long

19   ago.  I have found contradictions.  I have found

00:18 20   inconsistencies.  I have found statements by people who say

21   things like Tarek moderated their beliefs, things that might

22   have helped at the bail argument maybe, but we're only getting

23   them now.  And the point is that we need to talk to these

24   people and we need to ask them about it and we need to ask them

25   about some of the main witnesses.

1          It's a small community.  We need to know the

2     background of people and we need to know a number of things.

3     And to say to somebody -- as I said, it's just ludicrous.  It

4     is hard enough to get people to talk to us, all right, because

5     the community is very fearful and very suspicious of outsiders.

6     So we go with our investigators and they want to make sure

7     we're really Tarek Mehanna's lawyers.  Sometimes it takes two

8     or three return visits to get people to talk to us.  And to

9     talk to them in cryptic language, "Oh, we can't tell you this

00:19 10   is a witness, but it might be.  This is somebody we want to

11     know about," just seems like even more suspicion and distrust.

12     And at this point we really have to go right to the core.

13          So I really see no need for the protective order at

14     this point.  We're not posting people's names online, you know.

15     We're not going to publicly put lists of people out there.  We

16     just want to be able to talk to our witnesses and do an

17     appropriate investigation.  And I think not allowing us to do

18     that is really ineffective assistance of counsel.  It is hard

19     enough, and you'll hear more about what the government's recent

00:19 20   disclosures are, but at the very least we want to do what we've

21     always done.  We want to do what lawyers do and what is

22     appropriate to do, which is to interview witnesses and

23     potential witnesses before trial with appropriate information.

24          THE COURT:  Mr. Auerhahn?

25          MR. AUERHAHN:  Thank you, your Honor.  Very briefly, I

1    think part of the problem is that the defense -- the government

2    offered to sit down with the defense to reach a mutual

3    understanding as to the parameters of the protective order, and

4    something else we could have sat down to discuss is, perhaps, a

5    modification of the protective order, but instead, they ask to

6    lift the protective order.  And the Court needs to realize, and

7    the defense should realize if they're asking to lift the

8    protective order period, end of discussion, then there are no

9    limitations placed on what they can do with all the volumes of

00:20 10   information that we provided to them about the whole government

11   investigation over the course of X number of years of the

12   defendant.  And as we say in our opposition to their motion,

13   that's a lot of information that could be helpful to the

14   enemies of the United States, as has been proven the case in

15   other instances.

16         So the website that she referred to is not the local

17   Muslim website but is an al Qa'ida website and al Qa'ida

18   magazine.  So it's not just the issue of the names of the

19   witnesses and the potential for pressure on the government

00:21 20   witnesses, which is still a factor to be considered.  It's also

21   the fact for potential negative -- not even negative, just

22   potential pretrial publicity, which is not in the interest of

23   either the government or the defendant if all this information

24   is no longer -- under any restriction whatsoever.

25         So if there were a discussion about modification of

the protective order with reference to identifying witnesses,
there are people whose names have come up in the course of the
investigation, again, as we say in our motion, who they can ask
people about as potential witnesses.  As they do their
investigation, they don't just talk to people about government
witnesses; they also talk to people about potential defense
witnesses.  So anyone who's identified in the community as a
friend or an associate or someone who was known to be close to
Tarek Mehanna can be the subject of questioning by them without
revealing that this person is a government witness or a
potential defense witness.  Either is not in the interest of
either the government nor the defense.

So the other thing, I've done a number of cases
involving Title IIIs that have similar protective orders, and
at some point in advance of trial there's been a modification
of a protective order so that you can, for example, sit down
with a witness who has been -- or potential witness who has
been intercepted and ask him to explain the conversation in
which he was involved.  And what that person does is he's not
given a copy of all of the discovery in the case, he's not even
given a copy of his own conversations, but he's questioned
concerning those conversations in which he was involved in.
And he or she also signs a protective order and is told they
can't just go back and tell all their friends about everything
that they've just heard or read in the lawyers' offices.

1       So I'm not suggesting we do that here; I'm just

2  suggesting that there are a lot better ways to deal with any

3  restrictions that have been placed on their trial prep without

4  lifting the protective order which is not in our interest, not

5  in their interest, or in the interest of the United States.

6       THE COURT:  Well, to some extent, with respect to the

7  disclosure of the identity of government witnesses, it's simply

8  a question of timing, right, because eventually the witness

9  will be identified, necessarily.  So the question really is

00:23 10  what is the harm in the timing as it exists now three weeks

11  before trial.

12       MR. AUERHAHN:  Well, I think there it's a matter of --

13  you know, there is -- she identified pressure on individuals in

14  the community to come forward.  Well, there's pressure on

15  government witnesses not to cooperate.  They're reluctant.

16  They don't want their identities disclosed.  And they know that

17  it will be as soon as they take the witness stand, or at the

18  point that the jurors are asked if they know the individuals.

19  But the potential for, you know, pretrial pressure on them from

00:24 20  the community is still an issue of which we have to be

21  concerned.  And as we get closer to trial that pressure may

22  arise.

23       I mean, there has been -- people working on behalf of

24  the defendant are trying to generate publicity on his behalf.

25  I mean, they're out there trying to do that.  So it's of great

1    concern to the government that these witnesses will be further

2    pressured by the activity of people who are aligned with,

3    trying to protect, trying to work on behalf of the defendant.

4         MS. BASSIL:  Your Honor, I want to address one thing

5    about pretrial publicity.  It was this office that the first

6    thing they did is have a press conference talking about things

7    that aren't even coming into evidence, talking about shooting

8    at malls and shooting up this and shooting up that when they

9    knew there was no direct evidence of it, all right?

00:24 10         So the pretrial public publicity and the prejudice of

11    it has come from them, and come from them in spades, all right?

12    Every expert we've talked to, every person we talked to, the

13    first thing they said to us is, "What about the shopping mall

14    thing?  I don't know if I want to get involved."  So talk about

15    pretrial pressure on potential witnesses for us.  It's been

16    there from the beginning.

17         And as far as, you know, their concern that an

18    al Qa'ida magazine published a while ago, they published a list

19    of people that were on trial, as everyone well knows, the

00:25 20    person who published the magazine was killed this week in a

21    drone attack, all right?  So that magazine doesn't even exist

22    anymore.  So the point is you can't raise terror and 9/11 as an

23    excuse so we don't get a fair trial.  And I think we should be

24    able to talk to witnesses and talk to them in a straightforward

25    way.  We're not going to hand over discovery to witnesses, but

```
 1   we certainly want to show them a 302 and ask them, "Is this
 2   what you said?  Is this the kind of thing you know?"
 3          THE COURT:  Let me -- before I come back to witnesses,
 4   because I think that's what this is all focused on, you also
 5   mentioned the family.  Is there any reason why the family
 6   members, which I assume is a relatively limited number,
 7   couldn't simply execute the protective order as it's been done
 8   for other people affiliated with the defense?
 9          MS. BASSIL:  It says that: "family member."  So we'd
10   be happy to have the family execute it, but it explicitly
11   excluded the family members.
12          THE COURT:  Let me ask the government:  Would you
13   object to an explicit undertaking similar -- perhaps edited a
14   little bit to cover them?
15          I don't know.  How many people?  Three people.
16          MS. BASSIL:  Three people.
17          MR. AUERHAHN:  Your Honor, quite frankly, my concern
18   is not with his parents but with his brother who seems to be
19   the organizer of this FreeTarek.com movement which is trying to
20   generate and educate the potential jury pool about this case.
21          THE COURT:  Well, if he signs it --
22          MS. BASSIL:  Nobody's getting copies of things.
23          THE COURT:  If he signs an explicit order then you
24   actually have more protection.  He's subject to the
25   jurisdiction of the Court at that point.  I think the family
```

00:26  (line 10)
00:26  (line 20)

1      can be dealt with that way.

2             MS. BASSIL:  Thank you.

3             THE COURT:  Now, with respect to witnesses, I

4      guess -- I mean, I think it's a legitimate concern that the

5      defense be able to talk about potential evidence, both the

6      government's and defense evidence, with potential witnesses.  I

7      guess the one thing I'm curious about is whether the

8      witnesses -- sometimes the witnesses's affiliation will be

9      obvious.  You know, you'll know which side the witness is

00:27 10  aligned with from external criteria.

11             MS. BASSIL:  Right.

12             THE COURT:  To the extent it's ambiguous, is it

13      necessary to say "This is so-and-so.  He'll be a government

14      witness" or "This is so-and-so.  He'll be a defenses witness"?

15             MS. BASSIL:  Well, it's not necessarily that.  Well,

16      at this point -- I mean, when you're asking a witness

17      about -- I mean, it's obvious, all right -- it's obvious about

18      certain witnesses that they're going to be government

19      witnesses.  There's no way around it.

00:27 20             THE COURT:  Well, there may be people involved in

21      events, for example, people involved in exchanging e-mails or

22      conversations or whatever --

23             MS. BASSIL:  Right.

24             THE COURT:  -- and it may not be obvious whether

25      they're simply participants unrelated to the trial or whether

1    they actually have an active role in the trial.

2            MS. BASSIL:  But, you know, we're talking to people

3    who -- we wouldn't be talking to them if we didn't want

4    information from them about the trial.  And it's going to be

5    obvious that we're asking about particular witnesses because

6    we're looking for information.  I mean, I don't think that I've

7    ever investigated my own defense witnesses, gone to other

8    witnesses and said, "What do you know about them?"  You know,

9    it's obvious that it's government witnesses.

00:28 10           And there are times when we want to show -- and there

11   are people, by the way, who the government either interviewed

12   or there's references to them, who are not witnesses of the

13   government, and we want to talk to them --

14           THE COURT:  Right.

15           MS. BASSIL:  -- and we want to be able to show them,

16   perhaps, an instant message or an e-mail or a document or a

17   302.  And I'm not saying -- we're not giving copies to people,

18   but we want to be able to show them and ask them pertinent

19   questions about them.

00:29 20           THE COURT:  Just so there might be some record of how

21   broadly information might have been disseminated, are you

22   willing to make an ex parte submission as to who the

23   information is going to be shared with?

24           MS. BASSIL:  Well, nothing's been shared with --

25           THE COURT:  No, but at some point.

1          MS. BASSIL:  Yes.  Yes.

2          THE COURT:  In other words, not for the government to

3    see so they don't know trial preparation strategy, but in an

4    ex parte way so that there is an affirmative record if ever

5    that needs to be considered.

6          MS. BASSIL:  Yes.

7          THE COURT:  Okay.  Under that condition, then I think

8    the information can be shared with people who are prospective

9    witnesses.  Let me ask -- yes, prospective witnesses, I guess.

00:29 10   And the family we'll deal with by special exemption to the

11   order and an undertaking by the family members.

12         MS. BASSIL:  Thank you.

13         THE COURT:  Otherwise, I think the other restrictions,

14   more broadly, public media, defense counsel in other cases and

15   so on, those restrictions remain in place.

16         MS. BASSIL:  Well, let me talk about other counsel,

17   your Honor, because --

18         THE COURT:  In other cases.

19         MS. BASSIL:  I'm sorry?

00:30 20   THE COURT:  Other counsel in other cases.

21         MS. BASSIL:  Well, yes.  Okay.  So a couple of things,

22   all right?  There is a limited world of lawyers that deal with

23   these kinds of cases and there are people with far more

24   experience than us.

25         THE COURT:  And you've hired most of them.

1          MS. BASSIL:  One.  We've hired one.  But -- and

2     especially in mid-trial and right before trial we would like to

3     be able to talk with them about things.  Obviously, they're not

4     going to be reviewing the world of discovery.  That isn't even

5     feasible.  But we want to be able to talk to them and say, you

6     know, "How do you deal with XYZ?"  "How have you dealt with

7     XYZ?"  Again, I'll submit something ex parte about --

8          THE COURT:  Well, for now I think we'll keep that

9     restriction in place.  You know, it will depend.  I can

00:31 10     conceive of some very general questions that doesn't touch the

11     evidence, "How have you dealt with evidence of a coconspirator

12     in a material support case" or something like that and very

13     little -- broad level of generality.  Another thing, "How have

14     you dealt with this particular piece of evidence?" if it's

15     common to both cases.  That may be a more specific -- for now

16     if there's something specific -- but I think the -- we've

17     expanded the personnel, including legal personnel, and I just

18     don't think the need is as strong as --

19          MS. BASSIL:  How about concerning the experts?  The

00:31 20     government experts.

21          THE COURT:  And you would ask, what, some other lawyer

22     about --

23          MS. BASSIL:  Cross-examining a particular expert.  One

24     of the government witnesses has testified, as they know, many,

25     many times.  A lot of his stuff is cut-and-paste; he testifies

1    to similar things over and over again.  Different lawyers have

2    dealt with it in different ways.  We would like to be able to

3    talk to him.

4         THE COURT:  You're getting, I think, the government's

5    response to the expert indicated some testimony -- prior

6    testimony will be given.

7         MR. AUERHAHN:  Yes, which we provided.  I believe

8    we've already provided every transcript we could find in which

9    the expert previously testified.  So certainly in terms of

00:32 10   questioning other lawyers about -- we do that as well -- about

11   cross-examining particular experts, pointers, some insight into

12   how that person is as a witness, et cetera, et cetera.  That's

13   not covered by the protective order.

14        MS. BASSIL:  Sure it is.  Expert reports are covered

15   by -- I mean, I would think it would be.

16        THE COURT:  Well, I'm not sure that the expert reports

17   were in the heartland of what the protective order was

18   thinking.  That's not sensitive information.  So I think

19   there's an acknowledgment.  You could do that.  You can ask

00:32 20   people who have been in other trials about the testimony, and

21   using the expert reports.

22        MR. AUERHAHN:  Yes.

23        MS. BASSIL:  Okay.  Great.

24        THE COURT:  Okay?  I think that -- so that deals with

25   231.  There was, speaking of expert reports, also Number 240, a

 1    motion for access to the materials referenced by the expert

 2    witnesses in their expert report.

 3          MS. BASSIL:  Right.  The government has actually

 4    provided a great deal of that, and there is only one small

 5    piece I would ask them to provide which is the few selected

 6    messages from the '05 version of the Tibyan Publications

 7    website that they provided to a particular expert, and that's

 8    the only thing I would ask --

 9          MR. CHAKRAVARTY:  I think we did provide it on

00:33 10    Thursday or Friday of last week.

11          MS. BASSIL:  All right.  So that's the only piece that

12    I didn't see.  And everything else --

13          THE COURT:  Okay.  So that motion is resolved.

14          MS. BASSIL:  That's resolved; yes.

15          THE COURT:  Okay.  Now, the latest controversy.  Go

16    ahead.

17          MS. BASSIL:  Well, Friday night at 5:40 we had -- and

18    I'm going to use this word literally, had another hard drive

19    dumped on us -- three new hard drives from the U.K. involving

00:34 20    two voluminous investigations.  The summary from the U.K. said

21    that these investigations involve over two million documents,

22    all right?  The government is -- first of all, let me say that

23    these drives -- the evidence they want to put in is not only

24    highly prejudicial but also completely irrelevant.  These are

25    people who are tangentially -- in fact, even not connected to

1    the defendant.  And it's part of what the government has done

2    in this case.  They list them as unindicted coconspirators I

3    assume for no particular reason other than to put in hearsay as

4    an exception -- you know, for the coconspirator exception to

5    the hearsay rule.

6          So what I can tell you is there are three new hard

7    drives.  We think we know who they are.  Two of the hard drives

8    was a man who was arrested -- about to go from the United

9    Kingdom to Pakistan on a plane and had equipment on him.  He's

00:35 10   listed as an unindicted coconspirator.  There is no connection

11   to the defendant other than "39 Ways" was found on his hard

12   drive, as well as an Arabic version, and I believe the

13   translated video was on his hard drive.  No IMs with the

14   defendant, as far as we know, no e-mails.  Thousands of other

15   documents in this person's two hard drives, instant messages,

16   e-mails from others who believe similarly.

17          And we would want to have -- you know, we'd want to be

18   able to show a jury that this man might have had "39 Ways" and

19   the "Expedition of Umar Hadid" on his hard drive, but he also

00:35 20   had thousands of other documents to which the defendant had no

21   contribution whatsoever, minimizing whatever impact the

22   defendant had on this person.  And, in fact, this is what the

23   government has done repeatedly:  They have cherry-picked things

24   to give to the experts without covering the whole scope of the

25   case.

1          So there's that sifting through.  And there are

2     hundreds of thousands of documents, I assume, on these two hard

3     drives.  We have spent, as you know, an extraordinary amount of

4     money on the tech person.  We could hire him, we could hire

5     every tech firm in the Boston area for the next two years and

6     not be finished with these hard drives.

7          The third hard drive that was dumped on us Friday is,

8     we believe, the hard drive of, yet again, an unindicted

9     coconspirator.  And they say the case involving this person was

00:36 10     an inquiry that went through 27 countries and over two million

11     files.  The "39 Ways" apparently was found on the person's hard

12     drive but, you know, we don't know what other documents were on

13     there.  And so there's a couple of things I want to say about

14     this:  This hard drive -- these hard drives are way too much

15     information.  They contain very prejudicial things.  On one

16     was -- let's see.  "Evidence:  I've discovered two copies of

17     MyDadTheBombmaker.com."  Our client had nothing to do with

18     this, there's no connection to him, but they want to put this

19     in.

00:37 20          They want to talk about a person who was connected to

21     the third hard drive who was a Swedish person that -- a search

22     warrant in Seriago where bomb-making material was found.  You

23     can see this begins to exponentially go anywhere the government

24     wants it to and we're losing complete focus.  We're losing the

25     focus on this case.  And what this is requiring us to do, aside

1    from the fact that we can't possibly get through this

2    discovery, is essentially also be forced -- and I don't know

3    how we do this -- but trying other cases, U.K. cases within the

4    context of this trial.

5            The government, in order to get information from the

6    U.K., they have to go through something called the MLAT, a

7    letter for cooperation.  And they began this investigation back

8    in 2005.  We asked in February for MLAT letters and they said

9    it was classified, all right?  So now they dump it on us.  They

00:38 10   had MLAT letters -- they interviewed a witness years ago in

11    Finland, twice, and they had to have MLAT letters in order to

12    get the cooperation of the Finnish police who were in the

13    interview.

14            This production delay is just simply -- I know of no

15    other way than it is good faith.  You cannot dump on a Friday

16    night, you know, hard drives on someone and say, "Oh, well, you

17    know, we're only using a small piece of it.  We're only using

18    two things from it or three things from it, but have fun with

19    the rest of the millions of documents."

00:38 20           And it just really -- we can't possibly review all of

21    this.  And I'll say it quite honestly:  I don't want to

22    continue this trial.  I want my life back.  I want to try this

23    case on the date that we said, and all my other clients and all

24    my other cases are lined up right after this.  But, you know,

25    we are in this horrible position.  It is one thing -- when you

kept asking the government if there was anything more that was

coming you were told, "Oh, it's a little bit of *Jencks*.  It's

not too much."  Well, the *Jencks* was a little more than a

little bit, I will say that, but that's not three new hard

drives, all right?  That's not what "a little bit" is.  And

what I find is -- you know, theoretically, we were going to

start this trial tomorrow.  So the government was dropping,

what, 72 hours before the start of a trial an enormous hard

drive with an enormous amount of information?  You know, it

00:39 just basically defies any logic or justice or anything.  How

can anybody try a case when things like this are dumped on them

the last minute?  I mean, I just don't know how we could be

ready.  I mean, frankly, I think none of it is relevant, and we

are asking you to exclude it because that's what makes the most

sense here.

They added 11 witnesses from the U.K. the last time we

were in court, and we have yet to get much of a description

about what they're going to say or do.  We know there were

these investigations because they've sent us minimal

00:40 information.  The investigations in the U.K. went over years

and years.  You know, it just -- I don't know what else to say.

I'm just dumbfounded by this.  Dumbfounded.

And, you know, what do we do?  We try the rest of this

case and we just let all of this stuff come rolling in and all

the work we've done means nothing?  And it is just -- it is

1   complete ineffective assistance of counsel if all of this stuff

2   comes rolling in because we don't have the ability to challenge

3   it.  And let me give you an example about another thing -- two

4   things specifically.  The origin and pathways of how things get

5   on people's hard drives are very important; for example, the

6   government had alleged that the defendant's -- that

7   Mr. Mehanna's hard drive had pictures of Nicholas Berg

8   beheaded.  Our expert was able to show those were cached; he

9   did not download them.  There are other documents the

00:41 10   government is attributing to our client, we are going to be

11   able to show that those files were never opened or unzipped.

12   So that's the same thing with this, all right?  And it takes

13   our experts -- I mean, that -- it takes them a long time to do

14   this.

15          So that's my piece on this.  I don't know what to do

16   anymore.  I'm just completely dumbfounded by it.  I find no

17   excuse for this whatsoever.

18          THE COURT:  Mr. Chakravarty?

19          MR. CHAKRAVARTY:  Your Honor, obviously we just

00:41 20   received the motion.  We've asked for more time to respond.

21          THE COURT:  Right.  Right.

22          MR. CHAKRAVARTY:  But let's put in context what we're

23   talking about here.  There were three additional hard drives

24   that were produced last week to the defense -- last weekend, I

25   believe, maybe between -- within the last ten days.  They

1    involved two separate investigations conducted by the United

2    Kingdom, one which they call Operation Mazhar and one which

3    they call Operation Orbile.  They are very different types of

4    investigations relevant to the case, but that context is

5    important.

6          As part of the allegations in this case, the

7    defendant's activities in support of al Qa'ida and terrorist

8    organizations is relevant both with regard to his personal trip

9    overseas in order to avail himself of terrorist training and

00:42 10   participate in al Qaida's and related terrorist groups'

11   activities, as well as some of the activities that he was doing

12   online when he was unsuccessful -- after he was unsuccessful in

13   his personal physical attempt.  He used what abilities he could

14   do, using his linguistic abilities and his computer abilities,

15   to disseminate propaganda, essentially, which was supportive of

16   and essential to the al Qa'ida mission.  Some of that material,

17   the actual documents themselves, were found on his own hard

18   drive and his own -- amongst his own materials, but also some

19   of it was found overseas.  So that's some aspect of the

00:43 20   relevance of something that may have been found on someone

21   else's computer overseas.

22          In the Operation Orbile circumstance, there was an

23   individual who was en route to Afghanistan, and with

24   night-vision goggles and several other materials, and one of

25   the other things he also happened to have was the medium which

1    the defendant had translated and generated, furthering the

2    actual relevance to show that he actually did make a difference

3    with respect to the influence of some of the Jihadi materials

4    that he had translated.

5          The significance of that is exacerbated when you

6    recognize that he also communicated -- the individual in that

7    Operation Orbile matter had also communicated with the same

8    coconspirators that the defendant was communicating with for

9    purposes of translating them in the first place.  So it's this

00:44 10   so-called triangle of conductivity where even though the

11   defendant may not have known this individual, he was part of

12   the conspiracy designed to disseminate this material so people

13   would do exactly what that individual did, which was to go into

14   a war zone in the name of Jihad or in support of terrorist

15   organizations.

16         The point on that is we gave notice to the defense

17   that we were going to have these witnesses come in and testify

18   that we found this document -- we found these messages on this

19   computer.  We found those particular files from a variable

00:44 20   warehouse of information that is a hard drive.  Understanding

21   that the U.K. computer forensic experts would be testifying

22   that they searched this hard drive and they identified the

23   specific files, the two or three files that we were actually

24   going to introduce, that so-called expert testimony, because it

25   would be the basis of their opinion as to where they found

these materials, as I think we've discussed in court, certainly
with defense -- if they want all of the underlying materials so
they could assess whether those experts have done an effective
job, then they will want the underlying hard drives.  So
pursuant to the MLAT, we obtained the hard drive in order to
give the defense, understanding that we haven't gone through
the hard drive, your Honor.  We're relying exclusively on what
the U.K. witnesses are going to say about how they came to this
information, this person who's going to engage in violent
conflict was -- had on his person at the time of his departure
this -- the materials which the defendant translated.

        The Operation Mazhar is a different triangle of
conductivity.  Again, the allegation is not that the
defendant -- and those people -- I should say that the owners
of those hard drives are unindicted coconspirators and there is
some evidence of conductivity.  Part of that conductivity with
the defendant was through their activities on this Tibyan
Publications website.  And the theory of relevance there and
why the U.K. witnesses will select a handful of files to say,
"These are relevant to demonstrating that conductivity between
the defendant and these individuals," is that those individuals
were obtaining, directly from the Abu Musab al-Zarqawi group in
Iraq, raw video footage of the media which was then -- went
through Tibyan Publications, went then to the defendant.  He
would translate it, distribute it back to Tibyan Publications,

1  and then it would be distributed worldwide so that others could

2  join the al Qa'ida cause.

3        It's that conductivity which is important to both the

4  government's theory of the case as well as to demonstrate that

5  the defendant was working with others, some of whom he may not

6  have known, but were part of the conspiracy.  And so it seems

7  to me that the challenge to the government's so-called dumping

8  evidence on them is this is an underlying basis of opinion,

9  material, which the defendant has requested in order to

00:47 10  challenge the forensic work of the U.K. computer experts.

11        But in terms of notice as to that we were going to do

12  that, at least as late as August we explained the things that I

13  just mentioned to the Court.  We explained how the relevance --

14  and there's other evidence in the case that also furthers that

15  theory.  But the U.K. witnesses, that testimony, is going to be

16  crucial to allowing a jury to understand exactly how

17  that -- those triangles and how the defendant's online

18  activities were more than just freedom of expression but were

19  rather concerted efforts in order to help the terrorist

00:48 20  organization and other individuals around the world who were

21  working toward that same objective.

22        MS. BASSIL:  Your Honor, they're missing a leg of the

23  triangle, okay?  And this is what I just realized.  How do we

24  know this person who wanted to go to Pakistan was influenced by

25  the "39 Ways"?  We don't.  How do we know he might have thought

1    it was claptrap and that somebody else wrote a better

2    description of what he needed to do?  How do we know he wasn't

3    influenced by Anwar al-Awlaki's "44 Ways to Jihad"?  How do we

4    know he wasn't influenced by Inspire Magazine?  How do we know

5    that without this person testifying?

6         You're talking about -- I know experts can rely on

7    hearsay, but you're talking about not just hearsay; you're

8    talking about somebody from the U.K. deciding what the intent

9    was on somebody and what influenced them.  This is craziness.

00:48 10    This is just so beyond what would be reliable.

11         And the other thing I want to say about this is the

12    government also misses the whole issue of this propaganda,

13    which is this:  Material support, all right, requires that the

14    person do something at the direction of, at the order of, or in

15    coordination with.  And both of the government experts talk

16    about the fact that -- and it's true, there is no -- you know,

17    al Qa'ida used to be a centralized, decision-making,

18    independent execution.  That is no longer true.  So, in fact,

19    the material support statute doesn't really apply anymore to

00:49 20    how terrorism cases have evolved.

21         Everything the defendant did online, whether it's,

22    quote, supportive or not, is protected First Amendment speech.

23    And, in fact, the government's saying these people have direct

24    connection to al Qa'ida, the government knows that the

25    defendant assisted in translating one video but it did not come

1    to him from al Qa'ida.  And they also know quite well that he

2    rejected doing anything more.  So to use the plural is

3    disingenuous and untrue.

4         And what I would say, your Honor, is how do we know

5    the person who was going to go to Pakistan that the greatest

6    influence on him was the copy of the Koran he carried with him?

7    I mean, we just don't know.  And, your Honor, if you want to

8    bring in all of these people from the U.K., so be it.  We'll

9    cross-examine them and ask them what the greatest influence was

00:50 10    on their behavior.

11         And I also want to say this:  There are a large number

12    at this point, over 100, convicted and accused people of

13    terrorism.  We want their hard drives.  We want to know if they

14    had the "39 Ways" on them or if they didn't, because the fact

15    is this is all circular reasoning.  Somebody did something bad,

16    they had thing "39 Ways" on it; therefore, the defendant must

17    have influenced them.

18         These people have huge hard drives and there's tons of

19    stuff on them.  In fact, as the government knows, the defendant

00:51 20    was kicked off Tibyan Publications because his views were too

21    moderate.  So, you know, do they know -- I mean, are there

22    documents in these people's hard drives about the more moderate

23    papers that the defendant published?  Do they know about that?

24    Did they -- I mean, it's just -- as I said, we're so beyond

25    what this trial is about that this is crazy.

```
 1              THE COURT:  Okay.  Well, the motion was just filed
 2    this morning.  I'm going to allow the government to file a
 3    written response by the end of the week.
 4              MR. CHAKRAVARTY:  By the end of the week.
 5              THE COURT:  Okay.  And let me just say I predict, if
 6    there is a remedy for the defense, it will be exclusion rather
 7    than postponement.  We're not postponing.  So that's -- I'm
 8    treating this as a motion to exclude, basically.  I say that so
 9    the government can have that in mind as it responds.
00:51 10              MR. CHAKRAVARTY:  Thank you.
11              THE COURT:  Okay.  I think that may be the general
12    business?  I know the defense has a matter or two that they
13    would like to be heard ex parte on.  Let me just ask --
14              MS. BASSIL:  I believe so.
15              We did disclose our experts, your Honor.  You should
16    have gotten a copy of that letter.
17              THE COURT:  Yes, we did.  Thank you.
18              MR. CHAKRAVARTY:  Your Honor, on the expert
19    disclosure, obviously, the government would want the actual
00:52 20    reports or opinions --
21              MS. BASSIL:  We're not doing reports.
22              MR. CHAKRAVARTY:  I understand that.
23              But some kind of deadline would probably -- would
24    definitely be helpful for us.  While we're not trying to get
25    blood out of a stone -- we know everybody is working hard -- we
```

```
 1   would like some advance notice --

 2          THE COURT:  Well, I expect the defense experts won't

 3   testify for awhile, so you'll have some time to deal --

 4          MS. BASSIL:  I am not asking them to write reports,

 5   your Honor.

 6          THE COURT:  The letter may be the summary?

 7          MS. BASSIL:  We can --

 8          THE COURT:  Rule 16 calls for a summary.  I haven't

 9   looked -- I received it.  I haven't looked at it in detail.

10          MS. BASSIL:  I thought the summary we gave was more

11   than adequate.  I wrote the summaries with Ms. Patel.  And we

12   even beefed up the summaries to make sure there was more

13   information in them.

14          MR. CHAKRAVARTY:  Well, the government obviously

15   disagrees in sum and substance, but I think the resolution may

16   be our motion to -- a motion in limine, perhaps, related to

17   that so that the Court can take it up.

18          THE COURT:  All right.  And again, are some of these

19   redundant?  I mean, I know in some cases people have backup

20   plans, if Expert A isn't available, you have B on the list

21   because B --

22          MS. BASSIL:  No.

23          THE COURT:  You expect each and every one?

24          MS. BASSIL:  Yes.  Each expert carries a particular,

25   separate expertise.
```

 1            THE COURT:  This is for both sides.  I will be on the

 2    watch for redundancy.

 3            MS. BASSIL:  I've been very careful.  I have.  And

 4    we've been very careful about making sure that the

 5    experts -- our experts are narrow and specific.

 6            THE COURT:  Okay.  Since we have experienced trial

 7    counsel here let me just ask you this.  This is a practical

 8    question.  We've been thinking about how many jurors we should

 9    summon in to end up with 16.  And we were somewhere around 120,

00:54 10   I think.  Does anybody think that's too small?

11            MS. BASSIL:  I do, your Honor.

12            THE COURT:  I'm having second thoughts.

13            MS. BASSIL:  I think, first of all, look at the length

14    of trial.  And last week -- you know, there was this arrest

15    last week, there's been stuff all over the paper, there were

16    the killings this weekend -- I mean, it's back up in the news.

17    So the length of the trial --

18            THE COURT:  It's going to be a few weeks off too.

19            MS. BASSIL:  Yes, but who knows what will happen

00:54 20   between then and now.  But 120 seems small to me.

21            MR. CHAKRAVARTY:  Your Honor, I agree just that -- I

22    think it's typically --

23            THE COURT:  What I was thinking of doing -- this will

24    take a little while to do.  And I guess what I was thinking of

25    doing is just take the 120, I was thinking of having 60 on the

first day and 60 called on the second day.  Maybe we should

just add another 60 for the third day, and if we don't need

them they'll get a pleasant phone call.  But that should be

enough, 180, I would think.  That's a less than a 10 percent

yield.  That ought to be okay.  Okay.  I appreciate your

thoughts on that.

        We'll recess the public session, and I'll see counsel

briefly in chambers.

        THE CLERK:  All rise for the Court.  Court will be in

recess.

        (The Court exited the courtroom and the proceedings

adjourned at 11:47 a.m.)

```
1                    C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4     the United States District Court, do hereby certify that the

5     foregoing transcript constitutes, to the best of my skill and

6     ability, a true and accurate transcription of my stenotype

7     notes taken in the matter of Criminal Action No.

8     09-10017-GAO-1, United States of America v. Tarek Mehanna.

9

10    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
11    Official Court Reporter

12
      Date:  June 7, 2012
13

14

15

16

17

18

19

20

21

22

23

24

25
```